Good morning, Your Honors. May it please the Court, Andrew Love for the Appellant, City of Roseville Employees' Retirement System. This Court's requested that we be prepared to discuss the recent Align decision, and I don't want to presume what the Court wishes us to address with regard to this case, but I think Align does provide a framework that would be helpful with regard to three points that will help hopefully understand and distinguish this case. First, that unlike Align, the statements here about Sterling's safe and sound banking practices were statements of opinion that conveyed certainty. Statements of, excuse me, statements of fact that conveyed certainty, not statements of opinion. Secondly, that unlike Align, the statements that conveyed certainty were about objectively verifiable facts, that Sterling was complying with regulatory safety and safe and sound banking practices. And third, assuming this Court finds that the case does fall under the Omnicare line of cases, defendants were aware of undisclosed facts, including that the regulators were finding unsafe and unsound banking practices that were not disclosed and tend to seriously concern. But I actually was focusing on something different, so maybe I should tell you and then you can comment on it. And that is if we, and that was the issue of Santer. And putting together in broad strokes what you've alleged with respect to the investigation, the positions that these executives held, and the time and circumstances of Mr. Gilkey's firing certainly raised certain suspicions, as you've indicated in your briefing. But it seems to me that the inference of no Santer is even stronger here than it was in Dearborn, and that's the issue I'd like you to address and contrast. So I think, so here we have, I think an important starting point for the defendants here is the July 23, 2008 Q&A during an earnings conference call in which both an investor and an investor and an analyst asked about upcoming regulatory exams at Sterling. And Mr. Gilkey said, well, we just finished a safe and sound exam at Golf, which was Sterling's other main subsidiary, that we had been taught, that he had talked with the regulators, even though he hadn't gotten a final report yet, and was anticipating the same kind of exam, safe and sound exam at Sterling beginning, he knew, beginning in October of 2009 and going to the end of the year, showing he was, and this was in Mr. Byrne's presence, and so this shows that they were very aware of these exams. And then in November, so the exams begin in October of 2008, and in November, there's a 10-Q filing in which defendants discuss, defendants indicated they were discussing with regulators certain practices that the regulators were considering about, one of them being using potential cash flows for collateral-dependent loans, which was against, in violation of a 2006 FDIC rule. So they're discussing, they say they're discussing this in November. In fact, they were caught violating this rule and had to change it. The 2006, if I could maybe walk through this, I'm not a banking expert, but if I could try to walk through this one unsafe and sound practice, I think it'll show that this was a clear violation. This wasn't a judgment call. So in 2006, the interagency policy statement states that consistent with safe and sound practices and GAAP, that for collateral-dependent loans, banks need to, can value the loan by comparing the loan balance with the value of the property that's securing the loan, and expressly prohibit it using potential cash flows in determining the value of the loan, so that if a loan is a million dollars and the property is worth $400,000, the bank has, the value of the loan is $400,000, and the bank has to charge off. Even if the collateral was pledged to pay off the loan and the collateral was solvent? This isn't a, this isn't a situation where there's a delinquent, a delinquent loan. So the... Well, but the collateral hasn't been realized upon. Right, but the, what the banks... Why is it different from insurance? It could be, it could be mortgage insurance. The critical part is that the only, the only thing that the bank, the only, the value of the loan can only be determined by the actual worth of the property, and not any potential cash flows. What, why, that just puzzles me. If you've got a solvent guarantor, right? Right. And he's collateralizing a loan, why is the loan restricted to the value of the property on which the loan is made? I don't, I don't know the reasoning for the rule. You don't know the reasoning, but... But the rule was very, very clear. This was not a judgment call, that if it's a collateral dependent loan that, and that's delinquent, the bank has to value the loan at the, under my example, $400,000 and charge off $600,000 to... Regardless of the mortgage insurance. That's correct. We'll have the other side on that. My worry about this, Mr. Love, is that having been an attorney for a bank or two in my life, there are a lot of examinations which happen. In the Carter administration, they had, and I'm old, so I'm back to the Carter administration, but when we had the Carter administration, they had one way of allowing the bank to report the loans. If the value of the collateral, meaning if the value of the property was more than sufficient to collateralize the loan, there was no trouble. Then we went to the Reagan administration, and the Reagan administration changed it and said, we're not worried about the value of the collateral anymore. Now we're worried about the cash flow. If the cash flow of the loan doesn't meet what needs to be to make the loan a valuable loan, then you're going to have to collateralize, you're going to have to determine it differently. I guess my worry about this is that it seems to me that if I'm to swallow that the district court was wrong on puffery, which you really haven't addressed, but if I'm even to swallow that, then it seems to me I have to determine whether the, if you will, the actual report or the actual determination by those who are examining the loans was prior to, contemporaneous to, or after. Because if we're just fighting about what we should do or how we should collateralize, it doesn't seem to me that that's important. It has to be when do they know for sure what the regulators have said and why. So when I look at contemporaneous and I look at the CDO, it doesn't seem to me that the CDO indicates that the findings were past practices necessarily. At the time it was issued, they were findings. But if I look at NOLTI, NOLTI says the CDO is issued when a bank is, has been, or is about to engage in unsafe or unsafe activities. So I'm not sure that I can say that's contemporaneous. So the, in addition to my earlier point, which I was trying to make, which was even before the regulators came in and found these unsafe and unsound practices, these defendants who were experienced bankers, Mr. Gilkey was past chairman of an advisory board that advised the FDIC. They knew what these rules were and they were violating these rules. But with the cease and desist order, it specifically says that they had reason to believe the bank had engaged in unsafe and unsound practices. And they were ordered to cease and desist from unsafe and unsound banking practices more fully set forth in the June 29, 2009 report of visitation. And that report of visitation was based on a joint field visit that began after the safety and soundness exam ended, which was in January. Can I stop you there on the timing? Because this is something I was trying to divine from the complaint. So you have this 2009 report, visit, et cetera. But according to the complaint, the log says the report isn't actually received until September of 2009. Is that correct? It wasn't received by the board. But that's not to say that Mr. Gilkey and Mr. Byrne weren't well aware of the findings because... Well, but was it a final report in June? The final report was in June. And so, but there still is this gap in terms of the timing of when the report is actually officially issued, right? As far as we know, the actual report, the report of visitation, was issued in June. But the allegations are that these regulators were present at the bank throughout this entire time. But even if the regulators are at the bank, again, that's another thing that kind of concerns me because being counsel for banks, regulators come in on audits all the time. And just because they're there, they don't ever talk to the people necessarily. And you can't say that just because somebody says the regulators were at the bank, that that necessarily means that people at the bank know what they're thinking. Well, that's why the facts I alluded to earlier, the July 23rd statement by Gilkey that with the other bank, he had been in discussion with the regulators about the findings at Golf before the final report came in. There's the 10Q in November 2008 where he talks about they're discussing these. They're actually, management is in discussion with the regulators. In terms of trying to have a foundation for the enter, we've got a report which doesn't come to the board until September. We have people who are regulators milling around the bank as Judge Smith says. And then we have the statement in July 2009. That's a pretty thin ice to skate on to sustain the complaint. So what do you have to fill that in? So the other part of that is that after the initial safety and sound examination, there's a report that comes out in January 2009. There's an exit interview with management before that. This is paragraph 72 and 74 of the complaint. And so the regulators have an actual exit interview with defendants and discuss their findings. If everything was fine with the potential cash flows, which they announced in January. So that's an unsafe and sound practice. But just a minute. I can understand they gave Sterling the January 2009 report. But what evidence is there in this record that says that the January 2009 report detailed unsafe and unsound practices? I think that can be. Because I couldn't find it. Well, right. We don't have access to that report. But the inference in this, I believe in paragraph 74, that the decision by the regulators to then continue to stay at the bank to have this joint field visitation from January until June certainly speaks to the fact that there are problems there. If there are no problems there, they wouldn't need to continue these follow ups. That's basically the foundation to sustain it is that the mere presence of these regulators milling around is a red flag of problems and therefore knowledge. Is that a fair restatement? That's part of it. And then there's, you know, these defendants, there's allocations about how hands on they actually were, that they were really involved in the, you know, minutiae of the bank's practices from setting construction loan limits to loan loss provisions. I mean, they were very involved. But even if we give you that, it doesn't seem to me that that satisfies what Judge McEwen is really putting to you. Because I tried to find, I mean, I couldn't find any evidence about what the January 2009 report said. I couldn't find that the June report is even known by anybody until September 2009. The confidential witnesses in my book, the best I can say about them is they have some assessment of the bank's practices themselves, but they don't know what happens during the exam. They have no idea what happens during the exam. And so then I'm saying, what else do we base this center on? So again, to go back to the July statement and then the November 10 Q, defendants are saying they are in discussions with the regulators during the safety and soundness exam. And there's an inference that since they're talking with the regulators during the first part of this analysis, that they continue to talk to them. Particularly when there are all these problems, that is the reason why the regulators are staying at the bank. And then they're fired. And then they're fired as soon as the cease and desist order issues. Did you want to, you have 30 seconds left. I'll give you a little extra time, but you may want to save the rest for rebuttal. Okay. Thank you. Good morning. May it please the Court, Barry Kaplan of Wilson-Sonsini on behalf of the defendants at Pelley's. I want to go directly to the CNTR discussion, which the Court seems to be interested in. But before I do that, I guess I should say that the entire CNTR argument or the entire effort to show a strong inference of CNTR seems to be based upon an allegation of blatant falsity, that there were statements that were made that were blatantly false. Because every other normal indicia of CNTR cuts the other way, frankly. And I think at the end of the analysis, a holistic view says that there is a lot of... I have a question on that holistic review. On a 12B6 motion, how is it that you, there was acknowledgment that Gilkey lost money on his investments and that he bought shares. Was that alleged in the complaint? No, it's not. But it was brought on judicial notice below. It was not challenged by the plaintiffs. There was no objection to judicial notice? Yes. Okay. Thank you. You've answered my question. Yes. And frankly, that's done in a lot of cases here. And on that particular point, I recognize that this Court has said that you take a holistic, and of course, the Supreme Court has said that you take a holistic approach. I've always wondered exactly how that works, because you have to look at the parts to begin with. And of course, the Ninth Circuit has said you first look at the parts and then you look at the whole thing holistically. If you look at the parts, and I'm just going to step aside from the allegation of blatant falsity for a second, everything else cuts in favor of not a strong inference of CNTR. There was tremendous amount of disclosure of incredibly difficult problems that the As Your Honor said, the confidential witnesses really don't add very much at all. There was no restatement. Very interestingly, neither Mr. Gilkey nor Mr. Byrne sold stock, which is really contrary to a strong inference of CNTR, and probably even more contrary is the fact that Mr. Gilkey purchased stock. And he purchased stock, a significant amount of the period when he is alleged to have fraudulently inflated the price of the stock. So if you think about it, that really is contrary to a notion of an inference of CNTR. And this court has many times pointed to those types of events as being indicative of a lack of CNTR. So the record also shows that Mr. Gilkey forewent getting a raise during this period, which has also been pointed to by the Ninth Circuit as indicating that if you try to make use of the fraud by increasing your compensation, that's an indication of CNTR. If you forego that opportunity, you could say that that is an indication that there is not a strong inference of CNTR. The firings don't really say much of anything because this was a bank that was deeply, deeply in trouble. And it is not surprising at all and certainly doesn't create an inference of CNTR when the CEO and CFO were fired. Well, it might not by itself, but I think the story that I gleaned from the complaint and the argument is that when you take the firing and the timing of the firing, and then you also take the investigation, the regulators at the bank, what was disclosed as part of those discussions while people were at the bank, plus the gap, which in and of itself wouldn't get you anywhere. But when you paint that pastiche, in their view, you then have a more holistic view that it will at least get you past the 12B6. Why isn't that the case? Well, because really when you add up all of the pieces, they don't really strongly indicate that there is a strong inference of CNTR. The firings, I will admit that one could say that the firings might look like they are indicative that someone felt that there were misstatements in the past. Remember, this is an indication of CNTR of false statements, right? But there's really nothing in the record that suggests, and there's no allegations in the complaint, that said that they were fired because they made false public statements. There was no restatement. The FDIC did not. CW4's testimony says that he heard that he was fired for fraudulent, they were fired for fraudulent conduct from another bank employee, didn't they? Doesn't CW4 say that? I think, if I remember correctly, CW4 basically says that they were fired, that she or he heard that they were fired because they had not brought these issues to the attention of the Board, and the Board was surprised about the CND. Now, that may be a good reason for it to be indicative of mismanagement, but it's not indicative of securities fraud to the investing public. So we think that, holistically, that there is not a strong indication of CNTR. Now, it's important, when we talk about this, as I said, it really boils down, in my mind, to the plaintiff saying that there were such blatant falsities that one could imply CNTR, and there are cases where there are blatant falsities, and you don't need to go beyond that. You can just look at that and say you presume that, if you were willing to say something that false, that you must have done it with an intent to make a false statement. But that's not really the case here. This is not a case in which someone says the car is red and it's obviously blue, and you can see very clearly that it's a false statement, or we had these contracts and they didn't have these contracts, as in some other cases. That's not the case here. The statements that were made here, and this is very critical because, obviously, this is a securities case, and the words are very important. There's been a lot of suggestions that what the company was saying is that we are engaged in safe and sound conduct that, in fact, the plaintiffs even argue that we are representing that we are in compliance with the law, that this is a strong statement, that we do not have any problems in connection with an FDIC audit, which is, of course, an ongoing issue, and there could always be safe and sound issues. But let's just very quickly look at the actual statements that were made. There's only five safe and sound statements. The first one, very early in this process, simply says, quote, we are managing... A definition from the FDIC manual. So do you accept that as a foundation? Yeah, that's an interesting definition, Your Honor, because that definition, in and of itself, basically says that this is a very general concept. In fact, I can quote from it. The FDIC manual itself says, quote, the concept of unsafe and unsound practices is one of general application which touches upon the entire field of operations of a banking institution. It would, therefore, be virtually impossible to catalog with a single, all-inclusive or rigid definition. Now, what that means is basically safe and sound is the same thing as saying banking almost. This is what banks do, and there's no specific definition of safe and sound. You don't think it's anything more than saying banks abide by banking laws? Well, what it means is that every aspect of a bank needs to be in accordance with safe and sound banking practices. But if you look specifically at what the specific allegations of alleged misstatements are here... Well, before you get there, are you really saying that that is mere puffery, then, the District Court thought it was? We are saying that it is puffery, but we're not just saying in the abstract it is puffery. Of course, puffery is something which is not objectively verifiable, and it's really important to focus... That's why I was going to say I don't know whether I really agree with the District Court that this is puffery, because it seems to me that this is at least... Puffery depends on the context in which it's made. That's our case of Police Retirement System of St. Louis. But we have to have a standard. The lack of a specific and definitional meaning renders safe and sound puffery. That's what the District Court said, but it seems to me this can be measured at least from the FDIC manual, so I'm having a tough time getting where the District Court got. Yeah, we absolutely believe that statements need to be looked at in context. And if you look at the statements that were made here in context, these were a couple of words that were used in the context of extensive, negative, dire disclosures about problems at the bank with... In fact, with respect to the last statement, I think the bank said that their classified assets went up three-quarters of a billion dollars. I mean, these were surrounded by extensive, negative warnings. And then in the course of that, the bank didn't say we are engaged in safe and sound practices that comply in every respect with FDIC regulations. In fact, I would like to point out of these statements, what did we say? We said in one statement in October of 2008, thanks to safe, sound, and secure banking discipline. Not we are engaged in safe and sound, but thanks to safe, sound, secure banking discipline. That's almost the exact phrase that is used by the Second Circuit, or that was used by J.P. Morgan Chase, who said... managing through a difficult credit cycle while maintaining a safe, sound, and secure banking practice. That's absolutely correct. That seems to me, when you read that with October 22nd, it's a little bit different flavor than you're now trying to show me. No, that was the very first statement. Safe, sound, and secure banking practice, that was stated in one day. The next day is... That was at the press release, right? Yeah, right. And then the next day, we say thanks to safe, sound, secure banking discipline. And then the three other statements are that we are committed to safe, sound, and secure banking practices. No, no, no, wait. Because in July, you didn't say you're committed. You said you're committed to continue. So when I read continue, it seems to me to imply that you've been having safe, sound banking practices, and now I'm going to keep doing that. So that's a little bit different than just simply saying there's a discipline. So how do you distinguish that July 2009 statement? Yes, it talks about a commitment to continue in a certain way. One could almost say that at the same time as you are acknowledging that you've done something wrong. I mean, I could, in pleading guilty, for example, to something, I could say I've done something wrong, but I'm committed to going forward not doing something wrong. But the fact of the matter is, if you look at each of these statements, they are so heavily surrounded by negative disclosures that this is really the small part of what the disclosure is, and that's why we call it puffery. This is not like, in a number of cases that this court has, it's not like Omnicare in which there's an explicit statement of legal compliance. It's not like Reese. It's not like Glaser in which there are formal reps and warranties. Is your point that surrounded by negative statements, any misstatement as to safe and sound practices is not material? We're saying that when looked at in context... It's not material. It's not. It's really not. It's not material. It's puffery, basically. As the court below found that when you look at these statements in context, they are not... First of all, they're not very specifically talking about regulatory... They're not talking about regulatory compliance, and they're much more general statements. Well, I guess if I read those five statements and I don't agree with you, then I proceed on to what we're now talking about, which that leads to falsity. We have to see if there's false or materiality, the issues which we are now talking about. Precisely, Your Honor. And that's actually where I was about to go, which is to simply say this. The reason I backtrack to talk about safe and sound is to say you may not be convinced that this is puffery. You may not be convinced that we think that these statements in context are not significant statements. So if you believe that there were misstatements, the misstatement case. And the point I was trying to make is, as opposed to... Since the whole scienter argument seems to be blatant falsity, that in this type of a statement where there's a definition which really is very general and says you really can't define things very clearly, and in which the statements were made while accompanied by extreme negative dire disclosures, that is not indicative of a strong inference of scienter. This is not a blatant falsity case. This is a case in which if the speaker stepped over the line in your view, then you're entitled to that view, but that doesn't indicate a strong inference of scienter. Now, with respect to the Align case, Your Honor, I know you wanted us to address that. I'll be perfectly honest with you. We were thinking of it in terms of its discussion of opinion testimony. As I stand here today, I can't really even recall what they said about scienter because it wasn't the focus of what we were thinking that the Court was interested in. All right. Thank you. Would you please give him a minute for rebuttal? Thank you. Thank you, Your Honor. One additional scienter fact, which also goes to the puffery issue as well, is context. Here, this is the midst of a huge financial crisis. Sterling has $3 concern about failing loans, problem loans, not enough capital. In that context, the regulators wouldn't just be milling about. They would be in contact with the management of the bank. You argue that, but I find nothing in the record to suggest that. Having been a lawyer for the bank, which I'm not putting in the middle of that, I want something more because I don't know what those regulators are doing. There's so many times regulators are in there. They can be there for decades, and you don't know what they're doing. Therefore, I look at that, and I say to myself, I wish Mr. Love had just a little more fact about just because they're there. What does that mean? I think this is one of those cases where there's a reasonable expectation that discovery would reveal those facts. We don't have those. Obviously, you're hampered. You need to get over that slight edge. Right. Frankly, in my book, you're hampered again by the fact that you are subject not just to the general pleading standards here, but we now have a pleading standard which makes it a higher case for you to plead. If I could just have one more second on this point. Again, the defendants were in discussion with these regulators. They knew very well why they were there. They mentioned that in July. They have these discussions in November. They have an exit interview at the end of the, when the report of examination is filed in January. They knew why they were there. They were there for important reasons because there are serious problems with the bank. Thank you. Thank you. I appreciate the argument from both counsel this morning. The case of Roseville Employees Retirement System v. Sterling Financial is submitted. Our next case for argument this morning is Reed v. City of Tacoma.
judges: McKeown, Bea, N.R. Smith